# In the United States Court of Federal Claims

No. 08-113C
(Filed August 24, 2011)

```
* * * * * * * * * * * * * * * * * * * * *   *
                                            *
ALCATEC, LLC,                               *   Contracts; counterclaim for
                                            *   forfeiture under the Special Plea
           Plaintiff,                       *   in Fraud (the Forfeiture of
                                            *   Fraudulent Claims Act), 28
      v.                                    *   U.S.C. § 2514 (2006); counter-
                                            *   claim under the False Claims Act,
THE UNITED STATES,                          *   31 U.S.C. § 3729(a)(1) (2006).
                                            *
           Defendant.                       *
                                            *
* * * * * * * * * * * * * * * * * * * * *   *
```

Phil B. Abernethy, Ridgeland, MS, for plaintiff.  Butler, Snow, O'Mara, Sevens & Cannada, PLLC, of counsel.

John S. Groat, Washington, DC, with whom was Assistant Attorney General Tony West, for defendant.  Jeffrey D. Klingman, Department of Justice and Linda D. Litke, DHS/Federal Emergency Management Agency, Washington, DC, of counsel.

## MEMORANDUM OPINION AND ORDER

MILLER, Judge.

The issue before the court after trial is whether errors made by a contractor in performing a contract are symptomatic of a scheme to defraud the Government.  The record in this case in many ways is a reflection of how the contract was performed by plaintiff and administered by the Federal Emergency Management Agency ("FEMA"): it reflects messy facts.  Therefore, the court is obligated to convey the impact of the evidence that the court found to be persuasive.  See Eon-Net LP v. Flagstar Bancorp, No. 2009-1308, 2011 WL 3211512, at *7 (Fed. Cir. July 29, 2011) ("When reviewing an exceptional case finding for clear error, we are mindful that the district court has lived with the case and the lawyers for an extended period.  Having only the briefs and the cold record . . . we are not in the position to second-guess the trial court's judgment.").  The trial that the court observed over eight days impressed the court with the fact that plaintiff's sole owner and Managing Member, Rosemary Ramirez Barbour, was hiding the ball in testifying so that it would be impossible

to determine exactly how she effected a fraudulent scheme—but that was exactly what took place.   In post-trial briefing, plaintiff's able counsel, who succeeded in considerably narrowing the scope of the court's factual inquiry, has cited portions of the transcript of proceedings in the light most favorable to plaintiff.   However, these excerpts cannot possibly capture the impact of the behavior and credibility of the witnesses, particularly that of Ms. Barbour.   Her testimony over two-and-one-half days, if nothing else, was clearly and convincingly exasperating.

Defendant's briefs set out a scatter-shot approach to evidence that is somewhat anecdotal, but that is the best that could be discerned from plaintiff's sloppy record-keeping that defendant was forced to build its case upon.   Although the following facts and analysis have been informed particularly by the court's assessments made during the course of trial, the court has not relieved defendant in any respect from its duty to produce clear and convincing evidence.

It also bears mentioning that plaintiff has contended repeatedly in briefs and argument that the Government's chagrin about the prospect of paying plaintiff millions of dollars under this contract sparked a crusade against Ms. Barbour.   Tr. at 1943 (Abernethy) ("The only reason we have an allegation of fraud . . . is that Alcatec had the gall to sue the Government over CLIN 1000.   Once there was a lawsuit, the Government had no defense to FEMA's clear intentional breach of contract for CLIN 1000, unless they could convince Your Honor that this $203,496 overpayment was a result of fraud, so as to affect a forfeiture.").   The court is mindful that FEMA is not pleased at having to own up to the wasteful expenditure of funds that is represented by this contract, and the court carefully probed the record for evidence of a vendetta.   However, trial convinced the court that FEMA's inexcusable mismanagement of the subject contract was separate and apart from the Government's realization and pursuit of its remedies concerning evidence of Alcatec's fraudulent billing practices. FEMA—which was forced by legislation to transition services required to cope with a major natural disaster from a large international contractor to a small, inexperienced local contractor—has egg on its face from the administration of this contract.   The findings that the court enters are not in aid of relieving FEMA of the consequences of its actions, but, rather, are the product of the evidence bearing on defendant's allegations of plaintiff's fraudulent conduct.

## FACTS

The facts in this fraud trial 1/ arise out of FEMA's continuing efforts to utilize local contractors following its initial response to the massive destruction wrought by Hurricane Katrina upon the United States Gulf Coast in September 2005.   To aid homeless victims,

_____

1/   Both the Facts and Discussion section of this opinion contain the court's factual findings pursuant to RCFC 52(a).

FEMA initially hired four international contractors to supply and maintain temporary housing units throughout the affected area. 2/  In accordance with the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. § 5150 (2006) (the "Stafford Act"), 3/ FEMA transitioned the maintenance and deactivation work of these mobile units to ten local contractors for the units located in the State of Mississippi.  Transcript of Proceedings, Alcatec, LLC v. United States, No. 08-113C, at 128, 1132-35 (Fed. Cl. May 9-12 & 16-19, 2011) ("Tr.").  On November 29, 2005, FEMA issued a Request for Proposal (the "RFP") for the "'Maintenance and Deactivation of Manufactured Homes and Travel Trailers.'"  PX 1 at 1.  The procurement was a "full set-aside for businesses certified under Section 8(a) of the Small Business Act."  Id.  The RFP scheduled a pre-proposal conference for December 7, 2005, and had a December 30, 2005 submission deadline.  Id.

Alcatec, LLC ("plaintiff" or "Alcatec"), was among the awardees.  Ms. Barbour, a native of Guatemala who earned a Masters in Business Administration from the University of Mississippi, holds the position of Managing Member, and is plaintiff's sole owner.  Although Ms. Barbour's background at that point encompassed political experience as a confidential assistant in bilingual education to the Department of Education, her experience managing federal contracts was limited.  In 2000 Ms. Barbour formed Alcatec, LLC, as an Internet company that subcontracted work on a Department of Energy website.  Alcatec also was employed to build mobile laundry and shower units for the United States Army (the "Army").  When Hurricane Katrina struck the Gulf Coast in 2005, the Army contracted with Alcatec to build these mobile laundry and shower units and to provide catering services.  The record is not clear on point, but it appears that plaintiff worked in some capacity, and possibly as a subcontractor, for the international contractor Bechtel Corporation on at least some of the latter's contracts.  However, Ms. Barbour and plaintiff had no prior experience tantamount to the type of services provided in inspecting mobile homes as a small business contractor for the Government.

On April 18, 2006, Alcatec was awarded contract number HSFEHQ-06-D-0428.  DX 38 at 1.  The contract was an indefinite-delivery, indefinite-quantity vehicle that provided a fixed rate for services.  PX 1 at 8.  Plaintiff was compensated for the completion of a series of discrete activities related to the mobile homes, including performing monthly preventative maintenance inspections of each mobile home, responding to emergency and routine

---

2/  Unless noted otherwise, the court will use synonymously the terms "tractor trailers," "mobile homes," and "mobile units."

3/  The Stafford Act requires that preference be given to local contractors in the spending of federal funds for "major disaster or emergency assistance activities."  42 U.S.C. § 5150.

maintenance calls as requested, and "deactivating" mobile homes no longer used that were transported to a different location.  PX 2 (Performance Work Statement).

## I. CLIN 1000

The first year of the contract was divided into tasks that were labeled for the purposes of billing with corresponding Contract Line Item Numbers ("CLINs").  PX 6 at 5.  Among the tasked items in dispute is CLIN 1000 for "phase-in" tasks.  Id.  Work under CLIN 1000 required a contractor to

> perform any and all efforts necessary . . . to ensure the ability to successfully perform the tasks and activities associated with this contract. . . . This include[d] . . . establishing procedures for performing the tasks within the time periods identified, establishing professional relationships and familiarity with the coverage areas and FEMA requirements, obtaining necessary equipment, and hiring staff.

PX 2 at 1.  Within thirty days plaintiff was to complete its phase-in period and be prepared to service over 1000 mobile units.  Id.  According to the Performance Work Statement, CLIN 1000 was contracted at a fixed rate of $6,111,000.00.  PX 6 at 5; see also id. at 19 (FEMA Task Order for phase-in services at "Firm Fixed Price" of $6,111,000.00).  On May 5, 2006, plaintiff and the other contractors were notified that they were to proceed with the phase-in portion of the contract, to be effective May 1, 2006 – May 30, 2006, and upon completion of the phase-in work, plaintiff was to submit "a summary report as the backup documentation, along with your invoice amount which invoice amount is the lump sum amount as stated in CLIN 1000."  PX 7 at 1.

On June 2, 2006, plaintiff received FEMA's public voucher for completed phase-in work in the amount of $6,111,000.00.  PX 6 at 35.  Around this time plaintiff completed its phase-in work under CLIN 1000.  See Tr. at 146-47 (Barbour).  However, in an e-mail from FEMA representative Mary Brewin to Ms. Barbour, FEMA reduced the amount owed under CLIN 1000 by $4,173,912.00.  PX 10 (e-mail from Ms. Brewin to Ms. Barbour dated May 29, 2006).  The e-mail claimed that a modification was required to correct an "error unknown to the Government until after the contract was awarded accepting Alcatec's proposed cost of $6,111,000.00 for CLIN 1000."  Id.  FEMA asserted that the price was agreed to on the basis of plaintiff's preparing for 6,700 units at a price of $912.00 per unit, thus totaling $6,111,000.00.  Consequently, the phase-in price was lowered to reflect the "actual number of units that were received by Alcatec" during the thirty-day phase-in period, a total of 2,124 units.  Id.  The e-mail explained that, at a rate of $912.00 per unit, the contracting officer's technical representative (the "COTR") was authorized to pay Alcatec only $1,937,088.00 for

phase-in costs, id., even though the COTR had "certifie[d] that the services were performed" in his authorization of partial payment issued on July 11, 2006, PX 11.

As a result, on July 20, 2007, plaintiff submitted a Request for Final Contracting Officer's Decision to the contracting officer as a certified claim under the Contract Disputes Act of 1978, 41 U.S.C.A. § 7103(f)(5) (West 2011) (the "CDA"). 4/ PX 16. The claim recited that plaintiff had contracted for the lump sum of $6,111,000.00 for the phase-in work under CLIN 1000. Id. at 2. After an additional payment of $327,440.31, id., plaintiff asserted a claim against the Government in the amount of $3,846,471.69, id. at 3. The Government did not respond to Alcatec's demand for payment, and the claimed unpaid balance of CLIN 1000 became the basis for plaintiff's present complaint. See Compl. filed Feb. 26, 2008, ¶¶ 10-16. Defendant resists payment on the basis of its counterclaims alleging that plaintiff defrauded the Government both by knowingly submitting vouchers contrary to the contract's terms and by either duplicating or falsifying inspection reports. The Government thus takes the position that plaintiff forfeited any right to payment under CLIN 1000.

The court cannot glean from the record how the required tasks to "complete" CLIN 1000, including "establishing procedures," "establishing professional relationships," and gaining "familiarity with the coverage areas," prefatory to assuming responsibility for the maintenance of mobile units previously supplied by an international contractor amounted to a value of $6,111,000.00 in services. PX 2 at 1. While how FEMA managed to overprice plaintiff's contract by a factor of three remains a mystery, CLIN 1000 carried a fixed-unit price of $6,111,000.00. PX 6 at 5; see also id. at 19. Defendant provides no evidence to the contrary.

Michael D. Keeney, an impressive FEMA COTR, colorfully and somewhat charitably expressed that the Stafford Act "introduces a level of inefficiency" in order to stimulate the local economy. Tr. at 1132-33 (Keeney). However, despite the less than ideal contracting situation in which FEMA found itself, FEMA stumbled in pricing CLIN 1000, with apparently no one to blame but the agency itself, and defendant's fraud counterclaims are the only defense to plaintiff's claim for the $3.8 million due on CLIN 1000.

---

4/  On January 4, 2011, Congress re-codified Title 41 of the United States Code, resulting in a renumbering of the provisions of the CDA. See Act of Jan. 4, 2011, Pub. L. No. 111-350, § 3, 124 Stat. 3677, 3816-26 (to be codified at 41 U.S.C. §§ 7101-09). Because the renumbered CDA provisions have not been published in a supplement to the United States Code as of this date, the court cites to West's United States Code Annotated.

II. CLINs 1001, 1002

CLINs 1001 and 1002 are the two CLINs at issue in the Government's fraud counterclaims. CLIN 1001 is the line item designated for monthly preventative maintenance inspections ("PMIs") that Alcatec was to perform on each mobile home unit, regardless of whether the occupant made a maintenance request. See PX 6 at 5. Similarly, CLIN 1002 represented plaintiff's reimbursement for monthly preventative maintenance inspections for tractor trailers. Id. Both were billed at a fixed rate of $244.00 per unit inspected, which included all general maintenance work performed during business hours and the cost of all parts less than $250.00. Id.; see also Tr. at 197, 501-02 (Barbour). Central to the contract was the concept that the inspections were to be performed monthly and were not to be performed within fourteen days of one another. DX 38 at 38.70 ("The contractor will perform monthly maintenance service visits for each unit assigned. These visits must be at least 14 days apart."); see also Pl.'s Answer filed July 16, 2010, ¶¶ 12, 14 (admitting defendant's allegations in ¶¶ 12 and 14 of June 30, 2010 counterclaims that "Under the Contract, Alcatec was required to perform monthly [PMIs] on the homes in exchange of $244 per inspection" and that "[t]he reason for the 14-day rule is to ensure that the PMI's did not occur within 14 days of each other and not on, for example, the last day of one month and the first day of the next month."). Alcatec performed these inspections upon completion of the phase-in period from around June 2006 to June 2007. Plaintiff's submission of documents purporting to evidence completed PMIs for payment is the subject matter of defendant's fraud counterclaims.

A PMI was performed when an Alcatec inspector physically visited a mobile unit to ensure that no maintenance work was required. Alcatec originally employed independent contractors—paid $20.00 per inspection, plus the cost of fuel—to perform the PMIs. An inspector recorded a visit to a given mobile unit by completing a checklist that documented the mobile unit's condition (a "PMI checklist"). See, e.g., PX 66 at 6. A completed PMI required both the inspector and resident to sign and date the checklist. Id. If a resident was not home, three attempts were required, with a recorded date and time for each attempted inspection, in order for an inspection checklist to be deemed "complete" for the purposes of billing. PX 30 at 15 (U.S. Gov't Accountability Office ("GAO"), GAO-08-106, Hurricane Katrina: Ineffective FEMA Oversight of Housing Maintenance Contracts in Mississippi Resulted in Millions of Dollars of Waste and Potential Fraud 15 (2007) (the "GAO Report"), explaining that all local contractors believed that three attempts were sufficient before submitting an invoice, even though not a contractual requirement). 5/ In these circumstances

_____

5/   The GAO Report covered the generally ineffective oversight of FEMA over housing maintenance contracts in Mississippi. See PX 30 at 1. The report estimated that "FEMA's ineffective management resulted in about $30 million in wasteful and improper or potentially fraudulent payments to the contractors from June 2006 through January 2007

an inspection would be conducted solely on the outside of the mobile unit, with the second and third attempts accomplished by attempted telephone calls.  PX 70 at 2 (Alcatec PM Verification Procedures); see also Tr. at 752-53 (James E. Oliver, plaintiff's Chief Operating Officer) (testifying that FEMA "allowed us to make three attempts in order to perform an inspection . . . .  Two attempts could be by telephone.").  During the course of the contract, plaintiff added a field on the checklist for a supervisor's signature.  Compare PX 59 (representing specimen of original checklist without a supervisor signature line), with PX 66 at 6 (representing specimen of altered checklist with "Supervisor's Verification" section).  Field office supervisors gave inspectors a list of mobile units to inspect periodically throughout the month that constituted a "route list."  See, e.g., PX 61; Tr. at 742 (Oliver).

According to Ms. Barbour, a computer software system called CrossForms was the "heart of the operation" with regard to collecting information from checklists and generating route lists.  See Tr. at 355 (Barbour).  CrossForms originally was handled by a subcontractor, the Jones Group, LLC, a business development and project management company for federal projects, that was hired to manage the "call center."  See Tr. at 124 (Barbour); Tr. at 1310 (Gennie L. Jones).  Prior to the closing date of the RFP, Gennie L. Jones, Manager of the Jones Group, was tasked with finding a suitable computer software to "track the life cycle" of a work order.  Tr. at 1311-12 (Jones).  Ms. Jones selected and presented to Alcatec the CrossForms software, which was used by many leading fast-food restaurants.  Tr. at 1311 (Jones).  Ms. Jones, it should be mentioned, did not "clearly have an ax to grind with

---

5/  (Cont'd from page 6.)

and likely led to millions more in unnecessary spending beyond this period."  Id. at 6.  Plaintiff levies the report's finding that "'FEMA made $15 Million **in payments** for preventative maintenance based on potentially fraudulent invoices,'" Pl.'s Br. filed July 22, 2011, at 10 (quoting PX 30 at 41), against defendant's expert Navigant Consulting, Inc.'s assessment that the Government overpaid Alcatec $203,008.00, id. (citing Def.'s Br. filed July 7, 2011, at 4).  Plaintiff contends that, comparatively, Alcatec is responsible for only 1.3% of the total improperly billed inspections: "if Alcatec had a scheme to defraud the Government based upon fraudulent inspection reports, it was not a very good or successful scheme."  Pl.'s Br. filed July 22, 2011, at 10-11.  In minimizing the total number of inspections to overbillings, Alcatec's comparative analysis is fundamentally undermined because Navigant did not review the entire universe of documents, confining its review to 14,000 PMI checklists, payroll records, time sheets, and correspondence seized by the Federal Bureau of Investigation.  See Tr. at 1365 (Steve A. Reighard, testifying Navigant expert).  In any event, the comparative percentage of fraudulently prepared checklists is irrelevant.  See Daewoo Eng'g & Constr. Co. v. United States, 557 F.3d 1332, 1341 (Fed. Cir. 2009) ("[F]orfeiture under 28 U.S.C. § 2514 requires only part of the claim to be fraudulent."); see also Little v. United States, 152 F. Supp. 84, 87-88 (Ct. Cl. 1957).

Rosemary Barbour," as plaintiff maintained in its attempt to marginalize her professionalism and impressive testimony.  Pl.'s Br. filed July 22, 2011, at 4.

Under Alcatec's system all work orders, for routine or emergency requests or requests for deactivation, were received by the call center, either by telephone call or e-mail, and dispatched to Alcatec's general maintenance workers (not inspectors). Tr. at 124, 199 (Barbour) ("[T]he heart of the operation for paperwork was the call center"); Tr. at 1314 (Jones).  During the transition period from the large contractors that performed the installation and initial maintenance work on the mobile units, in May 2006, Alcatec received all unit assignments as they came in and recorded these assignments into CrossForms.  Tr. at 1314-16 (Jones).  The Jones Group would call the residents twenty-four hours in advance and confirm an initial inspection appointment. Tr. at 1316 (Jones).  This schedule then was made available to the inspectors.  Upon completion of their designated inspections, the inspectors would send all PMI checklists, by manually delivering bundles of completed forms or by faxing the forms, Tr. at 213-14 (Barbour), to the call center to be recorded into CrossForms,  Tr. at 200, 213 (Barbour).  The call center recorded, among other items, the completion date of the PMI, the uniquely identifying FEMA barcode assigned to the trailer, and the address where it was located.  See Tr. at 214-15 (Barbour).

The Jones Group call center reviewed PMI checklists for completeness—whether they contained an inspector and the "PM Manager" (the supervisor) signature—and sorted the completed PMIs—whether there was no trailer on site, if abandoned, or whether an internal or external inspection was conducted. Tr. at 1317-18 (Jones).  The Jones Group would notify Alcatec of the number of completed PMI checklists and send any unsigned or improperly dated PMIs to Mr. Oliver. Tr. at 1318 (Jones).  The Jones Group then would export the PMI list in CrossForms to an Excel spreadsheet and sort by barcode to ensure no duplicate PMIs were included on the list. Tr. at 1320 (Jones).  If two mobile units were located at the same address, the Jones Group would designate one trailer as "A" and one as "B." Tr. at 1321 (Jones).

Alcatec maintained two offices, one located in Jackson, Mississippi, for management employees, including, at times, Renee Hood, Controller; Lisa A. Clayton, Ms. Hood's deputy, who served as Manager of Accounts Payable and Purchase Orders and who became the supervisor for a period; A.J. Hughes, who acted  as Human Resources Call Center Supervisor; Margie O. Barrett, who took over invoicing from Ms. Clayton and who acted as the Finance Manager; and Linda Higgs, in Human Resources. PX 69 at 7; Tr. at 194, 157 (Barbour).  The primary function of the Jackson office was to process invoices.  Mmes. Hood, Clayton, and Barrett all played a role at one time in providing Ms. Barbour with backup documentation (the lists of completed PMIs that would be used in invoicing) for an initial or resubmitted invoice.  Although Ms. Barbour reviewed the backup documentation and prepared the invoice, she never personally reviewed the inspection checklists.  She would

review the backup documentation, making notes on a summary spreadsheet prepared by her staff and asking for additional information where needed.  See, e.g., PX 43; Tr. at 282-83 (Barbour); Tr. at 699, 700 (Clayton).

Alcatec's Brooklyn, Mississippi office, or the "field office," comprised of the maintenance workers and sometimes the inspectors, was located on a fifteen-acre farm owned by Ms. Barbour.  Gary L. Worley was the field office operations manager beginning on June 16, 2006.  Tr. at 520-21 (G. Worley).  Steve Kennedy, followed by Clinton Jones, were the field office supervisors.  Tr. at 729 (Oliver); Tr. at 196 (Barbour); Tr. at 1520 (Garza).

The general maintenance technicians originally were separate from the preventative maintenance inspectors.  Tr. at 1878 (Oliver).  However, the makeup of the Alcatec workforce changed dramatically on November 15, 2006.  Following a Department of Labor audit, Alcatec was directed to cease using independent contractors to perform the inspections and required to use direct hires.  See PX 25 (e-mail from Mr. Oliver to COTR Mr. Keeney explaining shift in work force).  Employees then were paid $10.00 per hour, for forty hours per week, regardless of the number of inspections that they completed, with no overtime-pay option.  Tr. at 647 (Tonya D. Worley, a field inspector, and Gary Worley's wife).  When many of the independent contractors refused to be hired at the hourly rate, Alcatec was forced to hire new employees who were unfamiliar with the area and the routes.  See Tr. at 221-22 (Barbour) (describing difficulties in learning routes due to lack of house numbers, street signs, and other effects of devastation).  For a time general maintenance technicians were performing both PMIs and maintenance requests, before Alcatec was able to hire ten to fifteen additional employees dedicated solely to completing the inspections contracted for under CLINs 1001 and 1002.

As a result of the disruption in its workforce, Alcatec fell behind in completing its monthly preventative maintenance inspections for November 2006.  See Tr. at 224-28 (Babour).  In December 2006 Alcatec failed to inspect around 900 units of the approximately 2,000 units assigned to Alcatec at that time.  Tr. at 1879 (Oliver).  At a monthly meeting of the area contractors, Ms. Barbour asked Mr. Keeney, a project manager/COTR for the Bechtel contract on loan from the I.R.S. and later FEMA's COTR on plaintiff's contract, what the contractors should do if they could not complete the inspections for a given month.  See Tr. at 1118-20 (Keeney). He responded that he could only imagine a problem around the holidays. Tr. at 1181 (Keeney).  If performing December inspections was a problem, the contractors could perform those inspections in the beginning of January to complete billing for the December invoice, so long as Alcatec was transparent in its invoicing.  Id.  Mr. Keeney credibly testified that he did not remember any conversation with Ms. Barbour regarding inspections performed out of month after January 2007, Tr. at 1182-83 (Keeney), but also agreed that FEMA did not care how many trips a contractor took to get a valid PMI

checklist completed, as long as the inspection was valid when billed, Tr. at 1247-48 (Keeney).  According to Ms. Barbour, when she "made Mr. Keeney aware that . . . we were going to have challenges in completing the PMIs in November . . . [and] that we needed an extension . . . he did not make me aware of any problems that he saw." Tr. at 229 (Barbour).

On the same date of the Department of Labor edict, November 15, 2006, Mr. Oliver e-mailed  Mr. Keeney.  Alcatec was concerned about the impact of the Department of Labor's edict on Alcatec's ability to perform all required inspections.  PX 25.  Hiring the independent contractors as employees was "not a financially viable solution." Id.  Instead, Alcatec would seek to hire those qualified independent contractors as general maintenance technicians. Id.  Mr. Oliver requested that Alcatec be given an extension for the month of November or be allowed to complete November inspections in the month of December.  Id.  Mr. Keeney did not respond and forwarded the message on to someone he deemed to be the appropriate person to review such decisions.  He never responded or otherwise followed-up to ensure that someone from FEMA responded to plaintiff.  Tr. at 1250-51 (Keeney).

This inaugurated Alcatec's *ad hoc* procedure whereby its inspectors were directed to continue performing the list of inspections that they had not completed from a previous month, to be completed in the beginning of the next month, but not within fifteen days of one another. 6/  For example, a December 15, 2006 inspection could be completed on January 3, 2007, to be billed on the December invoice.  See Tr. 710 (Clayton) ("If you did an inspection on the 1st of January and you did another one on the 20th of January, the 1st of January's could be your January inspection.  Your 20th of January could be your February.").  Plaintiff took the position that, as long as the inspections were not billed within fourteen days of one another, two inspections within one month could be billed—one for the preceding and one for the current month.  See PX 28 (Jan. 17, 2007  e-mail from Mr. Oliver to Ms. Jones outlining new policies: "the guidance for the review and recording of PM inspections in December 06 is as follows: . . . As part of the December invoice, these inspections should be counted from the date of 1-15 Jan 07. . . . These inspections CANNOT have already been 'performed' in December in order to prevent the chance of invoicing twice in the same month").  Plaintiff's invoices reflect this new system, showing, for example, a December 2006 invoice that included inspections dated in January 2007.  See, e.g., DX 18 at 18.56.  It is this attributed knowledge on the part of FEMA that prompted defendant to acknowledge that FEMA knew that plaintiff was billing out of month, even though no such procedure was ever approved.  See Tr. at 108-110 (Groat).

The complicated practice led to a breakdown in Alcatec's relationship with its call center subcontractor, the Jones Group.  Ms. Jones, one of the more professional witnesses

---

6/  Mr. Oliver testified that the fifteen-day rule was a company policy to ensure that the contract's fourteen-day interval was observed.  Tr. at 771 (Oliver).

who testified, did not endorse Alcatec's new billing system.  Tr. at 1328 (Jones).  In November 2006 the number of completed PMIs had decreased dramatically, with plaintiff's inspectors reporting around one-third of the assigned inspections. Tr. at 1322 (Jones).  While Ms. Barbour and Mr. Oliver claimed that the Jones Group must have lost the PMI checklists, Ms. Jones maintained that the Jones Group had not done so.  Tr. at 1321-23 (Jones).  The court found Ms. Jones's testimony to be credible throughout.

The numerous problems persisted.  In December the number of unsigned PMI checklists and duplications had escalated. Tr. at 1328 (Jones).  Moreover, Ms. Jones testified that the Jones Group received December and January spreadsheets from Ms. Barbour in a January 31, 2007 e-mail that reflected a larger number of PMIs from Ms. Barbour than what the Jones Group had recorded.  Tr. at 1341-42 (Jones).  Problems with conflicting dates began to appear.  See Tr. at 1338-39 (Jones) ("Mr. Hughes had taken an adversarial tone because of the number of PMs that I was sending back . . . .  Yes, there were a lot of duplicates . . . . I asked him . . . to ensure that they were properly signed off on ahead of time and that the dates were in other, meaning that if a PM was done January 6, it should not be signed December 28th.").  Ms. Jones explained, "I wasn't comfortable with the work that should have been done in prior months being pulled forward to the other months.  I wasn't comfortable with the escalation in duplicate that I saw in December, November . . . . I wasn't comfortable with PMs not being signed by a PM manager, and once they were sent over, they came back with a date on them."  Tr. at 1328.  As a result, in January 2007, Ms. Jones submitted her ninety-day notice of resignation to Alcatec.  Tr. 1326-27 (Jones).  Two weeks later, on January 29 or January 30, 2007, Alcatec terminated its relationship with the Jones Group, and the call center responsibilities were transferred in-house to Alcatec's home office in Jackson, Mississippi, as of February 1, 2007.  Tr. at 1327 (Jones); Tr. at 447 (Barbour).

FEMA was generous in allowing plaintiff flexibility in performing services under the terms of the contract.  The contract called for monthly inspections on each assigned mobile unit to be performed not less than fourteen days apart.  DX 38 at 38.70 ("The contractor will perform monthly maintenance service visits for each unit assigned.  These visits must be at least 14 days apart.").  Plaintiff initially was required to send backup documentation with its invoices to FEMA on a CD-ROM in PDF format, id. at 38.25 (electronic invoicing requirement of subject contract), but was also required to maintain records compatible with Microsoft Access or Excel if requested by FEMA to provide detailed reports, summaries, or cumulative information on its recorded PMIs, id. at 38.64 (Performance Work Statement).

FEMA made numerous requests for Microsoft or Excel-formatted copies of Alcatec's invoicing once FEMA encountered problems in Alcatec's invoices with duplicates.  Because Alcatec was submitting its invoices in PDF form, FEMA staffers could not manipulate the document—for example, organize its contents by barcode—to discover possible duplications.  Tr. at 1155 (Keeney).  Rather, staffers resorted to manually wading through the hard copy

PDFs, even though FEMA repeatedly requested a "soft copy," or an Excel spreadsheet. Tr. at 1154-55 (Keeney). When Mr. Keeney requested that Ms. Barbour not provide the invoices in PDF, she responded that she was not obligated contractually to provide anything except the PDF. Tr. at 1155 (Keeney). Only when Mr. Keeney threatened to reject her invoice did she finally produce a document that FEMA could sort electronically. Tr. at 1155-56 (Keeney).

Another problem that FEMA encountered with Alcatec's invoices occurred when Alcatec faxed the lengthy backup documentation after normal work hours without warning. On one occasion the fax machine ran out of paper, so FEMA did not receive the invoice timely and then scrambled to pay a late invoice. Tr. at 1157-58 (Keeney). Although Mr. Keeney told Ms. Barbour that FEMA would not accept the invoices by fax, she again faxed her invoice in December 2006. Tr. at 1159 (Keeney).

After plaintiff started supplying invoices that were organized by barcode in its December invoice, FEMA began rejecting parts or all of the invoices because plaintiff was billing duplicate PMIs. In the December 1-31, 2006 invoice, the COTR at that time, Raymond P. Burgett, 7/ rejected a total of fifty-two of the submissions for CLINs 1001 and 1002 because of duplications found in the invoice. DX 18 at 18.53. In the January 1-15, 2007 invoice, Mr. Burgett rejected a total of twenty-eight duplicates billed to CLINs 1001 and 1002. Id. at 18.146. In the January 16-31, 2007 invoice, Mr. Burgett found "addition/multiplication errors" which led him reject the invoice. Id. at 18.173. Mr. Keeney rejected twelve CLIN 1002 submissions that Alcatec attempted to bill for the February 1-15, 2007 invoice that were "inspected" after the date the mobile units were deactivated. DX at 18.210. The amount rejected was valued at $2,928.00. Id. He did not appear to reject for duplications in CLINs 1001 and 1002 in the February 16-28, 2007 invoice. Id. at 18.236.

On April 9, 2007, for the March 1-15 and February 1-28, 2007 invoices, Mr. Burgett rejected the entire CLINs 1001 and 1002, amounting to $238,632.00, "due to excessive duplicates of invoice items which calls into question the entire CLINs." Id. at 18.282. Again, on April 12, 2007, in relation to what appears to be a re-submission of previous inspections, Mr. Burgett rejected the entire CLIN 1001, worth $28,792.00, and CLIN 1002, worth $132,736.00, stating that "due to recent discovery of double billing a complete audit of these two CLINs for double billing is required." Id. at 18.266. Alcatec was advised that these CLINs "[m]ay be resubmitted at a later date." Id. The parade of duplicates continued when, on June 1, 2007, for an April 16-30, 2007 invoice, which included March 1-31 and February 1-28, 2007 resubmissions, Mr. Burgett rejected six CLIN 1001 and 1002

---

7/ Although Mr. Keeney, who became FEMA's "lead" COTR, Tr. at 1178, was always involved in some capacity, Mr. Burgett took over as Alcatec's COTR around January 9-10, 2007. Tr. at 1171 (Keeney).

submissions as duplicates and inspections that occurred after the unit was deactivated.  Id. at 18.360-61.

Plaintiff finally was paid in full on September 12, 2007, for invoices covering March 16-31, 2007, and February 1-28, 2007.  Id. at 18.402. Again, on September 24, 2007, Mr. Burgett approved full payment on CLINs 1001 and 1002 for the March 15-31, 2007 invoice. Id. at 18.444.  However, on October 11, 2007, Mr. Burgett rejected twenty-eight submitted inspections for the November and December 2006 invoices because none of the inspections included the "Preventative Maintenance Inspection Backup."  Id. at 18.476-77.  Also on October 11, 2007, plaintiff submitted an invoice in which it credited back thirty-seven CLIN 1001 inspections, totaling $9,028.00, and 228 CLIN 1002 inspections, amounting to $55,632.00, both in the January 1-15, 2007 invoice.  Id. at 18.483.

Mr. Keeney personally did not review any of these invoices.  They were reviewed only by Mr. Burgett, who did not testify.  See Tr. at 1178 (Keeney).

The source of these numerous duplicative or incomplete checklists is disputed.  Ms. Barbour maintained that a flaw in the CrossForms software created duplicate inspections on the route list.  Tr. at 217 (Barbour).  If any of the data for a particular trailer was input differently by two call center technicians, the trailer would register as separate mobile units, and would not pick up a duplicate, or register as having been inspected, from month to month.  Id.  For example, if both the designation "TT" and "Travel Trailer" were used to record an inspection, CrossForms would register two separate trailers and would not count them as representing the same unit.  Id.  Ms. Barbour never explained why resort to the individual barcodes would not have prevented this problem.

Mr. Oliver asserted that the duplicates resulted from a breakdown in communication between the Jackson home and Brooklyn field offices, which led to a situation where real-time information was not being transmitted, coupled with a lag in time before the inspections were entered into CrossForms.  Tr. at 1066 (Oliver).  This, in turn, led to the production of bad route lists that ultimately led plaintiff's inspectors to perform duplicate inspections, particularly when the lists consistently were manipulated to account for additional temporary technicians employed to enable Alcatec to catch up.  Id.  Mr. Oliver testified that he often urged employees in the Brooklyn office to inspect the newest list for problems with duplicate inspections before distributing it to the inspectors.  Tr. at 1057-59.  In an e-mail to Mr. Burgett dated April 10, 2007, Mr. Oliver explained that the fifty duplicates produced in the March 1-15, 2007 invoice were the result of "inexperience and error" on the part of their new administrative manager (call center supervisor), Mr. Hughes.  PX 53.  In addition, Alcatec had been without a finance manager for almost three weeks.  Id.  To correct the situation, Alcatec hired an accounts receivable specialist, Ms. Barrett, to prepare future invoices.  Id.

13

The breakdown in communication between offices was further evidenced by the January 5, 2007 e-mail from Mr. Oliver to Mr. Worley questioning the performance of several of the inspectors.  PX 72.  Comparing the PMI checklists from four inspectors to the number of work orders that the inspectors reported to the call center, Mr. Oliver charged Mr. Worley with determining the route of the "questionable performance" of these inspectors. Id.  Mr. Worley's wife, Tonya, was among those with questionable performance.  Id.

E-mail correspondence underscores a company policy that purported to conform with the monthly inspection/fourteen-day rule.  Alcatec consistently was concerned with "scrubbing" the backup documentation for the list of PMIs to be billed to FEMA, meaning deleting any duplicates.  See Tr. at 270 (Barbour).  Mr. Oliver repeatedly instructed Messrs. Worley and Jones to follow the established rules: one monthly inspection could be performed on each unit, even if performed in the beginning of the current month for the prior month, but not within fourteen (later fifteen) days of the next inspection.  Mr. Oliver's justification for making sure that no duplicates existed was that they wasted time and impeded productivity.  PX 83 (e-mail dated March 15, 2007, from Mr. Oliver to Mr. Jones).  Mr. Oliver repeatedly insisted in his e-mails that the number of duplicates be reduced.  Id.  In a February 27, 2007 e-mail from Mr. Oliver to Messrs. Jones and Worley, Mr. Oliver instructed: "The techs/PMs must keep their routes list accurate and communicate their progress to you and then from you to Jackson.  We want to eliminate wasted trips to the same address . . . ."  PX 85.

On one occasion, in an April 20, 2007 e-mail, Mr. Oliver reminded supervisor Jones to ensure that the PMI checklists are "initialed/signed in the lower right hand corner labeled supervisor's verification.  This will stop some of the [PMI checklists] that are not counted here or that must be sent back for more information."  PX 45 at 1.  In an e-mail dated April 10, 2007, to Messrs. Jones and Worley, Mr. Oliver attached a list of fifty inspections "that we counted erroneously for March.  These are duplicates that were not counted and must now be re-inspected for April.  Please add these to your route list for March make-up inspections no sooner than 15 days from the date already inspected on the attachment."  PX 45 at 2.  He reminded Mr. Jones that inspectors must make three attempts before counting an outside inspection and submitting the checklist for invoicing.  PX 45 at 4.  He notified Mr. Jones on April 24, 2007, that Alcatec management found sixty-eight duplicates "that cannot be moved to a vacant date" in the PMI checklists submitted for billing, and asked Mr. Jones to examine named inspectors' routes.  PX 45 at 5; see also PX 75 (e-mail dated March 22, 2007, from Mr. Oliver to Mr. Jones stating, "We have pulled 73 duplications from the inspections received in 20-22 Mar 07."); PX 40 (e-mail dated September 10, 2007, from Mr. Oliver to Ms. Barrett, indicating in his review of spreadsheets that he highlighted entries that he believed were not inspected within a fourteen-day interval).

14

Ms. Barbour repeated these policies in her e-mailed instructions to her employees preparing the backup material for Alcatec's invoicing. An e-mail dated March 2, 2007, from Ms. Hood to Ms. Barbour stated that she had reviewed Mr. Hughes's spreadsheets for duplicates and requested permission to remove those duplicate inspections prior to submitting the February invoice. PX 36. In a September 24, 2007 e-mail to Ms. Barrett, who was preparing the backup information for re-submission of invoices not yet paid, Ms. Barbour instructed Ms. Barrett to have Ms. Barrett's assistant look over each work order, to attach the work orders she believed could be submitted properly, and to have Mr. Oliver "double check" their work before giving it to Ms. Barbour for review. PX 33.

In addition, the policies were repeated in all company documents instructing inspectors on the procedures associated with completing PMI checklists. The PMI checklist "Instructions," stated that "[e]very trailer on your route must be inspected monthly. No trailer will be inspected more than once in the same month, or no sooner than every 15 days." PX 68. As part of its "PM Verification Procedures," Alcatec required inspectors to determine whether "the PM [is] 15 day[s] from the last completed PM Inspection. . . . If not 15 days apart, then PM is a duplicate and can not [sic] be used." PX 70.

To solve issues with checklists that were undated, Mr. Oliver would follow up with the inspector. Several witnesses testified that they would give undated checklists to Mr. Oliver. See Tr. at 1318 (Jones) (testifying that she sent unsigned checklists or checklists with signature problems to Mr. Oliver); Tr. at 700 (Clayton) (testifying that if she had questions regarding integrity of checklist, including undated checklists, she would take it to Mr. Oliver); Tr. at 1853-54 (Hughes) (testifying that if checklist was undated, it would be sent to Mr. Oliver who would "pass [it] pm to the techs to rectify"). Mr. Oliver testified that Alcatec would occasionally date a PMI checklist at the office if he could verify the date with the inspector either from memory, in the inspector's work log, or from personnel records. Tr. at 1080-81. He insisted, though, that there was "no date created as far as I knew to fit a PM to a billing cycle, just out of thin air, to fit that billing requirement." Id.

However, several witnesses testified that, in order to catch up, management level employees instructed them to obtain more than one inspection and to leave blank the completion dates on the checklists. See Tr. at 544-45 (G. Worley) (stating that Mr. Oliver instructed inspectors to fill out two PMI checklists when inspectors went to inspect a travel trailer); see also Tr. at 1850-51 (Hughes) (recalling that at one weekly meeting Mr. Oliver indicated that the inspectors should "get two PM[I]'s signed, and basically leave the dates off"); Tr. at 658-59 (T. Worley) (testifying that Mr. Oliver instructed her to obtain more than one inspection at a visit and leave the dates blank so that management could "use them . . . where . . . needed").

15

Rene N. Garza, an Alcatec inspector, testified that she was instructed by her supervisor, Mr. Jones, to leave the PMI checklists undated. Tr. at 1524. In comparing the dates on copies of the checklists with her personal records, Ms. Garza realized that Mr. Jones later filled in the incorrect dates. Tr. at 1525-26 (Garza). She recounted that she angrily warned him against ever doing that again. See Tr. at 1526 (Garza). 8/ However, the pressure to complete PMI checklists continued, with Mr. Worley telling her to complete more PMIs than she was assigned. Tr. at 1527-28 (Garza). At a weekly meeting with Mr. Oliver, Ms. Garza recalled his pressuring the inspectors to perform additional PMIs. Tr. at 1529 (Garza). Then, in June 2007, she testified that Mr. Oliver called her on her work cell phone, but from a number that she did not recognize as Mr. Oliver's usual telephone number. Tr. at 1529-30 (Garza). He said that her route list included a number beside each trailer that represented the number of inspections that she needed to obtain. Tr. at 1530 (Garza). Some of the inspections went back as far as January. She was told to date the inspections for that day and sign them. Tr. at 1530. In other words, she confirmed that if she went to a trailer on June 6, 2007, needing three inspections, she would sign and date three inspections for that same date, June 6, 2007. Tr. at 1530-31 (Garza). When Ms. Garza confronted Mr. Oliver, he denied calling her. After her conversation with Mr. Oliver on June 6, 2007, Ms. Garza quit. Tr. at 1531, 1533-34 (Garza). Mr. Oliver denies ever giving any inspector instructions to perform multiple inspections. Tr. at 750 (Oliver).

As these events unfolded, Alcatec was under scrutiny for its performance of this contract. In February 2007 FEMA conducted an audit and requested all of Alcatec's original backup documentation of invoices from the beginning of the contract. Tr. at 249-50 (Barbour). Although FEMA apparently has not returned all original documentation to Alcatec, Tr. at 251 (Barbour), Alcatec often used faxed versions of PMIs as "originals," and so it retained some checklists in the Brooklyn office, Tr. at 255-56 (Barbour).

In June 2007 the Federal Bureau of Investigation (the "FBI") was investigating Alcatec. Specifically, Mr. and Ms. Worley worked with the FBI by attempting to record Mr. Oliver while he was instructing the inspectors to fill out more than one PMI checklist for an inspection during a weekly team meeting. See Tr. at 680-84 (T. Worley). Mr. Oliver stated that he was warned by another inspector that Mr. and Ms. Worley were attempting to record him via a hidden wire, while he was instructing the inspectors to get more than one

---

8/ The Transcript of Proceedings in this section omits testimony, which defendant brought to the court's attention. See generally Def.'s Mot. to Correct Tr. filed July 22, 2011. Where the court's notes reflect that Ms. Garza angrily told Mr. Jones that if he ever changed a date on her PMI checklists again "I would kill him," the transcript denotes "(Laughter)." See Tr. at 1526. The transcript overall is full of mistakes, and the court used its notes and those of its law clerk to confirm this testimony, but has confined its findings otherwise to the official transcript on file.

inspection per trailer.  Tr. at 849 (Oliver).  It does not appear from the testimony that their attempt was successful, but Mr. Oliver remembered Ms. Worley's asking questions at a weekly safety meeting about how to conduct a proper inspection—questions that he found suspicious because she should have known the answers.  Tr. at 849-51 (Oliver).

When Mr. Oliver reported the incident to Ms. Barbour, she instructed him to send an e-mail to Mr. Worley that outlined Alcatec's procedures.  See PX 77; Tr. at 851-52.  Mr. Oliver's June 13, 2007 e-mail to Mr. Worley questioned why Ms. Worley was asking "about procedures for completing a PM inspection."  PX 77 at 1.  Mr. Oliver attached a memorandum that clarified all procedures, stating, as follows:

> These inspections will be performed monthly on each TT/MH at least 14 days apart.  Only one inspection is authorized at a time and all inspections will be dated on the date that the inspection was performed.  Under no circumstances is any ALCATEC, LLC inspector or technician to perform more than one inspection at a time or to leave an inspection undated.

Id. at 2.  Mr. and Ms. Worley were both terminated within a week.  Tr. at 854 (Oliver).  When Mr. Worley was fired, he was physically escorted from the premises.  Tr. at 554 (G. Worley).

During trial the court advised the parties that the testimony of the Worleys would be given little weight, and the court has adhered to that ruling.  However, the consistency among the Worleys and Ms. Garza was evident.  The percipient testimony that duplicate inspections were ordered was confirmed by Mr. Hughes, a witness in whom the court could repose unqualified confidence.

Mr. Oliver himself was approached by the FBI on June 20, 2007, when the FBI came to his house at night and questioned Mr. Oliver regarding Alcatec.  Tr. at 1017-19 (Oliver).  The next day, while having a coffee off-site, Mr. Oliver told Ms. Barbour about the interview.  Tr. at 1019-21 (Oliver).  But see Tr. at 248 (Barbour) (testifying that she first became aware of FBI investigation during FBI raid).  Upon their return Mr. Oliver and Ms. Barbour encountered in full blaze the FBI's raid on Alcatec's premises.  Tr. at 1022 (Oliver).  The FBI seized all of Alcatec's files.  Tr. at 257 (Barbour) ("They took everything.  We were left with zero paperwork.").

Although all of Alcatec's documents were seized, the FBI allowed Alcatec to hire a photocopier to copy the seized documents.  Tr. at 290-91.  This allowed Alcatec, working in conjunction with its computer files, to undertake an internal investigation.

After the FBI raid, Ms. Barrett, who had started working one week prior to the investigation, became Alcatec's finance manager and oversaw the process of preparing backup documentation for re-submission invoices that FEMA had denied, but which Alcatec was invited to resubmit.  See Tr. at 1264 (Barrett).  Her responsibilities regarding billing previously had been performed by Ms. Clayton, Tr. at 1305 (Barrett); Tr. at 698 (Clayton).  Ms. Barrett did not have access to the original PMIs for the resubmission and relied instead on data in CrossForms and Excel spreadsheets.  Tr. at 252 (Barbour).

For each re-billing Ms. Barrett compiled for Ms. Barbour a spreadsheet and a cover sheet that summarized the CLINs that were being invoiced.  Tr. at 1265-66 (Barrett).  During the course of this internal research, Ms. Barrett occasionally discovered duplicate PMIs that had been billed.  Tr. at 1267-68 (Barrett) ("[T]here were several duplicates from the December billing to the January billing.").  Eventually, Ms. Barrett conducted her own month-to-month analysis of the invoices previously submitted to FEMA because "she noticed so many duplicates."  Tr. at 1268 (Barrett).  She compiled the data into a spreadsheet that was labeled during trial as the "Barrett analysis" and that demonstrates that numerous duplicate inspections were made during a month-to-month basis.  See DX 37 at 37.1 (showing an inspection for travel trailer 119286, performed on January 5, 2007, that plaintiff billed both in its December 2006 and January 2007 invoices); see also Tr. at 1271 (Barrett testifying to same).  Ms. Barrett testified that she shared her analysis with Ms. Barbour, Mr. Oliver, and an independent investigator retained by plaintiff's criminal attorney, Kenneth Breedlove, who indicated that he had performed a similar analysis and reached confirming results.  Tr. at 1281 (Barrett).  However, soon after this discussion, Ms. Barrett was transferred from her salaried position as finance manager, to an hourly employee as the human resources director.  Tr. at 1283 (Barrett).  She resigned shortly thereafter in March 2008.  Tr. at 1283-84 (Barrett).

An issue concerning performance of the PMIs in violation of the fourteen-day rule between billing cycles had been raised by Ms. Barrett's predecessor, Ms. Clayton.  Ms. Clayton recalled an instance, while working at Alcatec from September 2006 to June 2007, when she was instructed specifically to confine her search for duplicates to one invoice and not proactively to research the possibility of duplicates existing between invoices.  Ms. Clayton testified that Ms. Barbour instructed her to look for duplicates in an invoice that FEMA had rejected because of the duplicates.  See Tr. at 703 (Clayton).  Ms. Clayton compared the dates of inspections in that invoice to a previous invoice and discovered some duplicates.  Tr. at 704 (Clayton).  She reported the incident to Ms. Barbour, who instructed Ms. Clayton to confine her search to the present invoice and not to worry about "looking back."  Id.  Ms. Clayton left for employment with another company shortly after the FBI raid.  Tr. at 698 (Clayton).  However, the instruction from Ms. Barbour not to perform month-to-month analyses of invoices was repeated to Ms. Barrett in the resubmittal process.  Tr. at 1307-08 (Barrett).

The Government's expert Navigant Consulting, Inc., was retained to examine and analyze the documents, including 14,000 PMI checklists, payroll records, time sheets, and correspondence, seized by the FBI.  See Tr. at 1365 (Reighard).  Navigant's analysis, however, was confined to those invoices paid and excluded invoices that Alcatec submitted but that FEMA rejected outright, a total of 1,311 PMIs worth $319,884.00, DX 1 at 1.31, as well as an unknown number of PMIs that Alcatec resubmitted after June 2007.  Altogether, Navigant discovered 181 PMI's that were billed twice, 409 PMIs performed within fourteen days of each other, 204 PMIs that Navigant believes were originally blank PMIs that were dated in the home office, thirty-one PMIs that were billed with no trailer on site, and nine checklists that Navigant asserts represent duplicate checklists with a different date.  Id.  Navigant, through its testifying Director Steve J. Reighard, found that FEMA erroneously paid Alcatec $203,496.00 for these PMI checklists.  Id.

## DISCUSSION

I. <u>Special Plea in Fraud</u>

1. <u>Standards</u>

Defendant's counterclaims plead a Special Plea in Fraud for the forfeiture of plaintiff's claims.  See Def.'s First Am. Answer, Countercls. & Special Plea in Fraud filed June 30, 2010, ¶¶ 64-65 ("Countercls.").  The forfeiture statute provides, as follows:

> A claim against the United States shall be forfeited to the United States by any person who corruptly practices or attempts to practice any fraud against the United States in the proof, statement, establishment, or allowance thereof.

> In such cases the United States Court of Federal Claims shall specifically find such fraud or attempt and render judgment of forfeiture.

28 U.S.C. § 2514.  A predicate for forfeiture under this statute is the establishment of fraud, although the statute itself does not articulate the elements of fraud.

The United States Court of Appeals for the Federal Circuit has held that, to prevail on a counterclaim alleging fraud under 28 U.S.C. § 2514, defendant is required to "'establish by clear and convincing evidence that the contractor knew that its submitted claims were false, and that it intended to defraud the government by submitting those claims.'"  <u>Daewoo Eng'g & Constr. Co. v. United States</u>, 557 F.3d 1332, 1341 (Fed. Cir. 2009) (quoting <u>Commercial Contractors, Inc. v. United States</u>, 154 F.3d 1357, 1362 (Fed. Cir. 1998)); <u>accord</u> <u>Glendale Fed. Bank, FSB v. United States</u>, 239 F.3d 1374, 1379 (Fed. Cir. 2001); <u>Young-Montenay, Inc. v. United States</u>, 15 F.3d 1040, 1042 (Fed. Cir. 1994).  Proof of negligence

or ineptitude does not meet the standard of clear and convincing evidence; rather, "[a]n intent to deceive the Government must be proved." Miller v. United States, 550 F.2d 17, 22 (Ct. Cl. 1977). The court may, however, consider circumstantial evidence in making its determination. Kamen Soap Prods. Co. v. United States, 124 F. Supp. 608, 620 (Ct. Cl. 1954) ("About the only way a just conclusion can be reached is by placing the questioned documents and statements alongside well-known and established facts."). "[F]orfeiture under 28 U.S.C. § 2514 requires only part of the claim to be fraudulent." Daewoo Eng'g, 557 F.3d at 1341; see also Little v. United States, 152 F. Supp. 84, 87-88 (Ct. Cl. 1957).

The parties agree that plaintiff submitted invoices that included duplicate inspections. Tr. at 92 ("We agree . . . that the Government is entitled to a setoff in this case for the amount of those inspections that got paid by FEMA that should not have been billed to FEMA."). However, plaintiff maintains that any over-billing was a product of mistake and confusion and not the result of a scheme to intentionally defraud the Government. Pl.'s Br. filed July 8, 2011, at 6-7 ("[N]either [Ms. Barbour nor Mr. Oliver] contradicted the numerous documents on the record showing Rosemary Barbour's clear instructions to her staff to do their due diligence to avoid any improper inspections being included in invoices to FEMA."); Tr. at 299 (Barbour) ("We would never knowingly not accurately invoice the Government . . . . It did happen. I'm sorry about that, and it just slipped through the cracks."). If such intent to fraudulently complete PMI checklists existed, the intent was manifested solely by field-office employees, not by management. Plaintiff asserts that it cannot be held liable for the inappropriate acts of these field-level employees because none of the employees were involved in the invoicing process to FEMA. Pl.'s Br. filed July 22, 2011, at 12. Plaintiff divorces any act of misconduct in fraudulently completing PMI checklists from Ms. Barbour's or Mr. Oliver's knowledge of the accuracy of Alcatec's submitted invoices, id. at 14, and disagrees with a reading of the law that would bind Alcatec to the knowledge of low-level employees, id. at 12-17.

Defendant insists that plaintiff intentionally double-billed FEMA, billed FEMA for noncompensable work, and prepared and submitted fraudulent documentation as proof of its claim. See Def.'s Br. filed July 7, 2011, at 1. Based on Navigant's expert analysis, defendant asserts that plaintiff improperly billed 2,143 PMIs to the Government. Id. at 3. In addition, defendant cites to the testimony of Mr. Hughes that Mr. Oliver instructed the inspectors to complete two PMI checklists and leave one blank, Def.'s Br. filed July 22, 2011, at 6, and that of Mmes. Clayton and Barrett, who testified that Ms. Barbour directed them not to review month-to-month invoices for duplicates, id. at 5, in order to argue that management level employees were aware of and perpetuated Alcatec's fraudulent billing scheme.

2. Fraud in "proof" of claim

Although defendant has not submitted "direct and positive evidence," the instant case exemplifies a situation in which "[c]ircumstances altogether inconclusive, if separately considered, may, by their number and joint operation, be sufficient to constitute conclusive proof," N.Y. Mkt. Gardeners Ass'n v. United States, 43 Ct. Cl. 114, 137-38 (1908), because Alcatec's "made-up story [does] not fit into the scheme of events . . . [and] therefore, stand close examination," Kamen Soap, 124 F. Supp. at 620.   Clear and convincing evidence supports a finding that Ms. Barbour engaged in a continued effort to manipulate Alcatec's billing system that distorted the contractual requirements and ultimately perpetrated a fraud by intentionally falsifying dates on PMI checklists.

Alcatec created a chaotic billing scheme that made it difficult for FEMA to detect inaccuracies in Alcatec's billing.  In November 2006 Alcatec fell behind in performing the required monthly PMIs.  See Tr. at 224-28 (Babour); Tr. at 1322 (Jones).  To remedy the situation, Ms. Barbour adopted a system where her workforce would complete the December 2006 PMIs during early January 2007.  These January inspections were included in the December invoice.  See, e.g., Tr. at 710 (Clayton) ("If you did an inspection on the 1st of January and you did another one on the 20th of January, the 1st of January's could be your January inspection.  Your 20th of January could be your February.").  Invoices then were submitted bi-monthly, Tr. at 703 (Clayton), and the history of an individual trailer's inspections become difficult to track.  Ms. Jones, who was initially charged with "track[ing] the life cycle of [a] particular work order," Tr. at 1312, and was intimately familiar with the call center procedures and the CrossForm software, testified that one of the reasons that the Jones Group terminated its contract with Alcatec was that she was not comfortable with this new tracking process, see Tr. at 1348-49 (Jones).  To be sure, the pattern was not in conformance with the terms of the contract, which called for monthly PMIs, see DX 38 at 38.70 ("The contractor will perform monthly maintenance service visits for each unit assigned."), but Alcatec continued the practice throughout the course of the contract, Tr. at 1887 (Oliver) ("[W]e . . . never caught up.").  While Mr. Keeney and, hence, FEMA, was aware that plaintiff was making up inspections for several months, FEMA did not give plaintiff carte blanche to continue the practice beyond March 2007 (for February billings).  See PX 50 (e-mail dated February 1, 2007, from Mr. Oliver to Mr. Keeney alerting Mr. Keeney that Alcatec was behind in PMIs but should catch up in February).

Mr. Oliver and Ms. Barbour openly manipulated the invoicing system in order to charge for a performed inspection on each mobile unit every month.  PX 47 ("[W]e expect to have about 150-200 inspections that will NOT be counted for a variety of reason[s] . . . . We need to plan on moving some March inspections into Feb once we identify these missing units . . . ."); see also Tr. at 708 (Clayton) ("[W]e were making an effort to invoice for every inspection that was done, so if an inspection was done and there was an open slot that had

not been billed, and it had been over 14 days [within one month], then that inspection would be used . . . ."). An e-mail from Mr. Oliver reveals the true nature of Alcatec's concern for properly completing checklists: "[W]e have the following duplicate PM[I]s that cannot be moved to a vacant date." PX 45 at 5. Alcatec's concern with "scrubbing" invoices for duplicates reflected a desire to ensure that it could be paid, not a concern that the PMIs were completed properly. See Tr. at 704 (Clayton) (testifying that Ms. Barbour told her not to worry about "looking back" at previous months to determine if duplicates existed between invoices, but rather to confine her search for duplicate inspections rejected by FEMA to the immediate invoice); Tr. at 1307-08 (Barrett) (testifying to Ms. Barbour's instruction not to perform a month-to-month analysis of the invoices in search of duplicate inspections).

Alcatec employees instructed inspectors to leave checklists undated so that the dates later could be filled in to avoid checklists reflecting that a mobile home had been inspected twice within fourteen days, regardless of when the inspections were performed. Four witnesses testified that they were instructed to leave the dates on PMI checklists blank. See Tr. at 566 (G. Worley) (stating that Mr. Oliver instructed inspectors to fill out two PMI checklists when inspectors went to inspect a travel trailer and to "leave the blank date"); Tr. at 658-59 (T. Worley) (testifying that Mr. Oliver instructed her to obtain more than one inspection at a visit and leave the dates blank so that management could "use them . . . where . . . needed"); see also Tr. at 1524 (Garza) (stating that her supervisor Mr. Jones instructed her to sign, but not date, PMI checklists); Tr. at 1850 (Hughes) (recalling that at one weekly meeting Mr. Oliver indicated that the inspectors should "get two PM[I]'s signed, and basically leave the dates off").

As noted earlier, the Worleys betrayed an animus against Ms. Barbour and Alcatec. The court views the Worleys' testimony with skepticism and accords it little weight, other than to note that the less fulsome aspects were consistent with Ms. Garza, who came across as unflappable, and Mr. Hughes, who was a forthright witness and unbiased management-level employee. The evidentiary standards for a forfeiture are both high and exacting, and the record fully supports the finding that the inspectors were instructed to submit undated PMI checklists.

The interaction between Ms. Garza and Mr. Jones is noteworthy for two reasons. First, as an inspector, Ms. Garza understood the importance of dating PMI checklists properly. See note 8 supra (Ms. Garza angrily warned Mr. Jones about ever filling in an inaccurate date again). This understanding is echoed in the testimony of Ms. Worley, who stated that she left it up to the resident of the trailer as to whether he wanted to sign the undated, duplicate PMI checklists, Tr. at 660, and Mr. Hughes, who testified that he would return all undated PMI inspections to Mr. Oliver and they would come back with dates on them before they could be processed for invoicing, Tr. at 1854-57. All Alcatec employees who testified understood that the date the inspection was performed was of great importance.

Even though the inspectors understood that dates were important, PMI checklists still were given to the home office undated.  See Tr. at 1328 (Jones) (recounting increase in December of undated PMI checklists); Tr. at 711 (Clayton) (acknowledging that PMI checklists did come to the home office incomplete and undated).  Mr. Hughes testified that, after Mr. Oliver instructed the inspectors to "get two signed and to leave a date off," Tr. at 1851, PMI checklists "started coming in undated. . . . [T]here would be a duplicate barcode, so one would have a date and one would not," Tr. at 1853.  Plaintiff's explanation for why the home office received undated PMI checklists was that they (1) were a mistake, or (2) were the result of inspectors cutting corners, or (3) could have been corrected with information supplied by the field.  However, the court found unconvincing the notion that an inspector would leave the date blank, given that the inspectors and supervisors in the field office knew that a PMI checklist would not be processed for invoicing if it was undated and would increase the inspectors' work load for the next month.  See Tr. at 1918 (Oliver) ("If there was no dates on there at all, it was unusable."); see also PX 45 at 2 (e-mail from Mr. Oliver to Messrs. Jones and Worley dated April 10, 2007, instructing them to add duplicate PMIs to March make-up list). 9/

Witnesses also testified to other irregularities regarding PMI checklists.  Ms. Jones testified that the Jones Group received December and January spreadsheets from Ms. Barbour in a January 31, 2007 e-mail that reflected a larger number of PMIs from Ms. Barbour than what the Jones Group had recorded.  Tr. at 1341-42 ("[O]ur numbers for December and January were much lower than the number that we received on the spreadsheet from Ms. Barbour.").  Moreover, problems with conflicting dates started to appear.  See Tr. at 1338-39 (Jones) ("Mr. Hughes had taken an adversarial tone because of the number of PMs that I was sending back . . . .  Yes, there were a lot of duplicates . . . . I asked him to . . . ensure that they were properly signed off on ahead of time and that the dates were in order, meaning that if a PM was done January 6, it should not be signed December 28th.").  Mr. Hughes, who was Alcatec's employee charged with reviewing all incoming PMI checklists at one point testified that occasionally he noticed that certain residents' signatures did not appear consistent, and, upon a closer comparison to previous months, he would forward those "fishy" looking checklists to the "main office."  Tr. at 1857 (Hughes).

---

9/ The fact that FEMA itself failed to adhere to the contract and was on notice of out-of-month-inspections is unfortunate, but does not obviate the finding that plaintiff intentionally submitted fraudulent invoices.  While plaintiff raises a defense that FEMA's knowledge of the out-of-month billing and number of duplicates mitigates against plaintiff's "knowledge," Pl.'s Br. filed July 8, 2011, at 12, the court finds that FEMA was not on notice that plaintiff manipulated the dates on the PMI checklists.

The second important aspect of Ms. Garza's experience is that she confirmed that the data that Mr. Jones recorded for her was inaccurate by reviewing her personal records. <u>See</u> Tr. at 1525-26. She kept personal records that could be compared against the PMI checklists. <u>Id.</u> Therefore, the evidence supports a finding that Alcatec never took steps to do what was apparently possible: to verify that the PMIs were accurately dated and performed. Alcatec's contention that it was working hard and had policies in place to ensure that it properly performed these inspections, Tr. at 328 (Barbour) ("[W]e were constantly trying to make sure that the policies and procedures were being followed."), was undercut by evidence of its actual failure to take steps to ensure the accuracy of the PMI checklists. For example, Mr. Oliver reminded supervisor Jones in an April 20, 2007 e-mail to ensure that the PMI checklists are "initialed/signed in the lower right hand corner labeled supervisor's signature. This will stop some of the [PMI checklists] that are not counted here or that must be sent back for more information." PX 45 at 1. In fact, Alcatec did not require a supervisor's signature. Tr. at 1901-02 (Oliver). Nor did it compare checklists against available employee time records. Tr. at 1886 (Oliver). In these instances the record unequivocally demonstrates that the written policy was not followed, which is inconsistent with a finding that plaintiff acted in accordance with written procedures.

Defendant offers a different explanation for the undated PMI checklists, and it supported this position with documentary comparative analysis. Defendant asserts that, in accordance with four of its witnesses' testimony, management-level employees were instructing inspectors to leave PMI checklists undated that could later be dated as needed to fill in a "vacant date" for which plaintiff otherwise would be unable to bill. Evidence documents a discrepancy between PMI checklist dates and employee work logs. In particular, defense counsel directed Mr. Oliver to compare DX 31 at 31.2-31.3, a work log recorded by inspector Greg Turner with thirty-two time entries detailing the inspections completed by Mr. Turner on April 16, 2007, with several PMI checklists completed by Mr. Turner that were also dated April 16, 2007, <u>id.</u> at 31.4-31.11; <u>see also</u> Tr. at 1925-33 (Oliver). Mr. Turner's work log reported his whereabouts from 8:00 am until 8:30 pm, and it was verified by the supervisor. DX 31 at 31.2-31.3. Several PMI checklists located and reviewed by Navigant's Mr. Reighard that were completed by Mr. Turner and that are dated April 16, 2007, were not listed correspondingly on Mr. Turner's April 16, 2007 work log. <u>Compare</u> DX 31 at 31.8 (representing Mr. Turner's PMI checklist dated April 16, 2007, for mobile unit with 1375842 barcode), <u>with</u> DX 31 at 31.2-31.3 (representing Mr. Turner's work log for April 16, 2007, without mention of inspecting mobile unit 1375842). <u>See also</u> Tr. at 1932 (Oliver).

Adding to the suspect characteristics of these PMI checklists, each April 16, 2007 date was created with remarkably consistent penmanship, regardless of inspector. <u>Compare</u> DX 19 at 19.52 (representing PMI checklist completed by Greg Turner), <u>with</u> DX 19 at 19.53 (representing PMI checklist completed by Danny Ayers). Mr. Oliver testified that he

recognized the penmanship of dates as belonging to Josh Ayers, a "fellow who worked in the admin center."  Tr. at 1922 (comparing penmanship of date of DX 19 at 19.9, a checklist completed by inspector Danny Ayers on April 16, 2007, with DX 19 at 19.10, a checklist completed by Greg Turner on April 16, 2007).

Although plaintiff attempted to explain that the work log may be inaccurate, see Tr. at 947-48 (Oliver), especially if a PMI checklist was dated on the third-attempt call for a resident who was not present, see Tr. at 1932 (Oliver), this same discrepancy existed with regard to PMI checklists that were signed by residents, see, e.g., DX 31 at 31.9; id. at 31.2. Moreover, plaintiff's policy of verifying a correct date to fill in for undated checklists that came into the home office undermines its assertion that the employee work logs were inaccurate because plaintiff allegedly relied on these work logs to find the completed dates. See Tr. at 1918 (Oliver) ("If [a PMI checklist] couldn't be verified in some way by work log or something, it was unusable."); Tr. at 1937 (Oliver) ("There was a procedure if it came in with no date whatsoever to attempt to contact the field office to see if they had a record that it was done in their spreadsheet, when the inspections came back through their office.  If they had no record of it being done, it could be—the admin center would attempt to call the tech and see if he had something[,] a log in his truck or some memory of when he did it.").

"Taken together . . . the total effect of the activities surrounding the execution of the contract falls [inside] the scope of fraud."  Miller, 550 F.2d at 22-23.  Plaintiff offered, and the court finds, no explanation for undated PMI checklists other than that supplied by four government witnesses: that the inspectors were instructed to leave checklists undated so that Ms. Barbour could use them where needed to fill a vacant date.  The date on which each inspection actually was completed is pivotal to performance of the contract because the contract called for a monthly inspection of each assigned mobile unit not to be performed within fourteen days of one another.  See DX 38 at 38.70 ("The contractor will perform monthly maintenance service visits for each unit assigned.  These visits must be at least 14 days apart."); see also Pl.'s Answer filed July 16, 2010, ¶ 12 (admitting defendant's allegations in ¶ 12 of June 30, 2010 counterclaims that "[u]nder the Contract, Alcatec was required to perform monthly preventative maintenance inspections (PMI's) on the homes in exchange of $244 per inspection.").  The routine nature of the monthly preventative maintenance inspections was at the heart of the performance that FEMA contracted for under CLINS 1001 and 1002.  And, although defendant's evidence is predicated on an "extremely confusing" record, see Little, 152 F. Supp. at 87, relying on conflicting testimony and Navigant's "spot check" of PMI checklists that "revealed irregularities" in plaintiff's billing, see id. at 86, "it becomes manifest that . . . plaintiff knowingly submitted fraudulent claims," see id. at 87.

25

3.  Establishment of agency: who committed the fraud?

Plaintiff asserts that it cannot be held liable for the inappropriate acts of field office employees because none of the employees were involved in the invoicing process to the Government.  Pl.'s Br. filed July 22, 2011, at 12-13.  In other words, if a fraud was committed in completing PMI checklists, it was committed by low-level employees who were not acting as Alcatec's agents.  Indeed, the parties digress extensively in briefing this issue.  The court, however, need not reach defendant's theory of collective knowledge on the part of corporate entities, as Alcatec is bound by the knowledge and actions of its Managing Member Ms. Barbour and Chief Operating Officer Mr. Oliver, both acting in the interest of Alcatec.  See Long Island Sav. Bank, FSB v. United States, 503 F.3d 1234, 1249 (Fed. Cir. 2007) ("Under the general common law of agency, '[e]xcept where the agent is acting adversely to the principal . . . , the principal is affected by the knowledge which an agent has a duty to disclose to the principal . . . to the same extent as if the principal had the information.'" (alterations in original) (quoting Restatement (Second) of Agency § 275 (1958)); Wagner Iron Works v. United States, 174 F. Supp. 956, 958 (Ct. Cl. 1959) ("It has been often stated that a corporation can act only through its officers and agents, and when they are clothed with the authority to act for it, the corporation is responsible for their acts.").  If Ms. Barbour and Mr. Oliver are implicated in the above-described fraud, so, too, is Alcatec.

First, Alcatec's Chief Operating Officer Mr. Oliver was at all times immersed in the administration and oversight of PMI checklists.  While the court found Mr. Oliver, a retired Army colonel, to be a likeable person, the particularly credible Mr. Hughes testified that Mr. Oliver instructed inspectors to leave PMI checklists blank.  See Tr. at 1850 (Hughes) (recalling that at one weekly meeting Mr. Oliver indicated that the inspectors should "get two PM[I]'s signed, and basically leave the dates off").  All witnesses agreed that undated PMI checklists came to the home office and that these checklists were forwarded to Mr. Oliver.  See Tr. at 1318 (Jones) (testifying that she sent unsigned checklists or checklists with signature problems to Mr. Oliver); Tr. at 701 (Clayton) (testifying that, if she had questions regarding integrity of checklist, she would take them to Mr. Oliver); Tr. at 1853-54 (Hughes) (testifying that, if checklist was undated, it would be sent to Mr. Oliver).  Mr. Oliver was responsible for the oversight and dating of these PMI checklists in the home office.

Further, Mr. Oliver's insistence that "no date [was] created as far as I knew to fit a PM to a billing cycle, just out of thin air, to fit that billing requirement," Tr. at 1080-81 (Oliver), is unconvincing given the inconsistency both in his own testimony regarding work logs, compare Tr. at 1918 (Oliver) (testifying work logs were used to verify dates of completion to fill in blank dates on checklists), with Tr. at 947-48 (Oliver) (claiming work logs were often inaccurate), and the documents that he was responsible for shepherding, compare DX 31 at 31.8 (representing Mr. Turner's PMI checklist dated April 16, 2007, for mobile unit

with 1375842 barcode), with DX 31 at 31.2-31.3 (representing Mr. Turner's work log for April 16, 2007, without mention of inspecting mobile unit 1375842). As Chief Operating Officer, Mr. Oliver's actions in furtherance of inaccurately reporting completed PMIs on a specified date are sufficient to bind Alcatec.

What the court did not appreciate was Ms. Barbour's bumble-headed game of eluding answering defense counsel's questions. The non-responsiveness that became Ms. Barbour's refrain is captured by the following exchange with defense counsel, in which she explains the decisionmaking process that she, as chief executive officer of a company performing a multi-million dollar federal contract, undertook in determining whether to use independent contractors or employees:

> Q: Did you run your intention to use contract employees to perform preventive maintenance inspections through a lawyer?
> A: There was a discussion about that, I'm not going to lie, and I would never lie, and I will tell you right now you probably have the document with you too. It was a scratched that—I just recall this, and—
> Q: Do you recall the nature of those conversations?
> A: Well, it was more toward the hourly employees that I was—Gary said something about it Chinese. He interpreted it as Chinese, but it's in writing. And individuals that were at that meeting—you want me to mention the lawyer's name?
> Q: Please, if you would, answer the question as fully as you can.
> A: David Grishman was there and there was another lawyer there. I wanted to make sure I was doing it right.
> Q: And—
> A: And that piece of paper, I'm telling you, it's a loose piece—in the sense that it's—it was in a pad—I don't know what color the pad was, and I don't know if subsequently if its loose or not, but it was in a pad.
> Q: What was the subject matter of this meeting you had?
> A: I was talking about, you know, the—it was not SOP, it was the company's manual.
> Q: And what, if any, discussions did you have regarding the use of hourly employees?
> A: Oh, my goodness. No, I can't—off the top of my head I don't remember. It's all in writing. I see the piece of paper. I'm sorry, I can't talk about it. I would probably somewhere along the line—
> Q: I just want your best recollection. Do you have a recollection?
> A: I know it's a piece of paper and it's all in my handwriting. I cannot tell you the details of it. I'm so sorry. It happened a long time ago.
> Q: Do you recall any discussions of the use of contract employees?

A:  I don't know.

Tr. at 1634-36.

This testimony was illustrative of Ms. Barbour's part in the scheme—to put as many people and tasks as possible between herself and the fraudulently prepared PMI checklists. Ms. Barbour created a disjointed billing system that she now attempts to use as a shield from liability.  For her part, Ms. Barbour maintained strict control over the invoicing process, see Tr. at 1595 ("We made sure we had backup after backup after backup and we documented everything, so I am sure we have a lot of documents.  I am proud of that.  They did exactly what I told them to do."); Tr. at 404 (Barbour) (testifying that only she knew contract prices; not even Mr. Oliver has the prices for each CLIN).  Mr. Oliver never had access to Alcatec's financial records, which were controlled exclusively by Ms. Barbour.  Tr. at 405 (Barbour). Therefore, when Mr. Oliver, for example, told Mr. Keeney in his November 15, 2006 e-mail that it was not a "financially viable solution" for Alcatec to hire the independent contractors as employees, he did so at Ms. Barbour's direction.  See PX 25; Tr. at 405-06 (Barbour).

Even though invoicing was the only job that Ms. Barbour claimed to perform, Tr. at 1709 (Barbour) ("I was taking care of the other aspects, and the other aspect was the invoicing."), Ms. Barbour somehow had no direct knowledge of anything beyond reviewing the backup documentation, which consisted of a cover sheet summarizing the number of items per CLIN being billed and a spreadsheet of information, see Tr. at 282-83 (Barbour); Tr. at 1265-66 (Barrett).  Ms. Clayton, Ms. Barrett, or another employee would review the individual checklists or previous invoices, looking for problems.  See Tr. at 699 (Clayton); Tr. at 282-83 (Barbour).  She "relied totally on [her] admin center" to review documents used as backup for an invoice, Tr. at 1709 (Barbour), and all problems with checklists were brought to Mr. Oliver, Tr. at 394 (Barbour).

Even though she sat directly beside Mr. Oliver's office, Tr. at 718 (Clayton) (describing location of each managerial staff member's office), Ms. Barbour also claims to have no knowledge of Alcatec's daily operations.  See Tr. at 394 (Barbour) (stating that she would never review checklists for completion; all questions were brought to Mr. Oliver); Tr. at 1699-1701 (Barbour) (stating that she did not know the procedure for supervisor verification, a task that Mr. Oliver oversaw); Tr. at 1702 (Barbour) (claiming that she did not know how many inspectors Alcatec hired); see also Tr. at 410 (claiming that she did not know the daily quota for performance for inspectors).  But see Tr. at 1703 (Barbour) (testifying that she was told at a FEMA meeting that inspectors could each produce about twenty-five inspections per day, which is where she and Mr. Oliver got their twenty-five inspection per day quota).  In this way she seeks to disassociate herself with any direct knowledge of fraudulent activity with regard to individual PMI checklists, see Pl.'s Br. filed

July 22, 2011, at 12, because she "was never involved in how it got to [her]. All [she] received was the end product," Tr. at 1712 (Barbour).

However, the evidence shows Ms. Barbour actually was aware of irregularities in Alcatec's invoices and general practices. See PX 33 (e-mail from Ms. Barbour to Ms. Barrett instructing Ms. Barrett to have her assistant review each work order, attach the work orders that could properly be billed, and to have Mr. Oliver review her work). She was the one who instituted the out-of-month billing procedure. See Tr. at 229 (Barbour) (testifying that she initially confirmed the need to perform PMIs out-of-month with Mr. Keeney). She also was the person who refused at first to send FEMA a Microsoft or Excel copy of her invoices so that FEMA could more easily review her invoices for duplications, see Tr. at 1155 (Keeney), an act in violation of Alcatec's contract, DX 38 at 38.64 (requiring Microsoft Access or Excel records to be provided upon request), and who faxed lengthy backup documentation to FEMA in the middle of the night without warning, Tr. at 1157-59. Finally, Ms. Barbour was the primary contact for the Jones Group regarding invoicing. Ms. Jones testified that "in January we received two documents from Ms. Barbour, both on the same date, which was January 31st, asking us to turn them into a PM and stating that these are the PM's that will be billed for December and January, that will be presented in the PM format . . . and to ignore the 1800 that we had just received the night before from Ms. Renee Hood." Tr. at 1341 (Jones). Thus, Ms. Barbour was directly involved in what Ms. Jones considered a discrepancy in the number of PMIs that the Jones Group reported as complete and the number they received "on the spreadsheet from Ms. Barbour." Tr. at 1342 (Jones).

While she exhibited concern on paper that her employees "scrub" invoices for duplicate inspections, when two employees alerted her to problems with duplicate PMIs being billed between months in violation of the fourteen-day requirement, Ms. Barbour instructed each of these employees not to review month-to-month invoices. See Tr. at 704 (Clayton); Tr. at 1307-08 (Barrett). Plaintiff attempts to contextualize Ms. Barbour's instructions to Ms. Clayton—that FEMA rejected an invoice and Ms. Barbour was responsible for reviewing that particular invoice for duplicate PMIs. Pl.'s Br. filed July 22, 2011, at 3. Ms. Clayton's task at that moment was limited, but plaintiff asserts that "the Government was unable to produce a single witness from Alcatec's home office who testified that Rosemary Barbour ever instructed them to ignore duplicate inspections when 'scrubbing' the backup documentation for invoices being submitted to FEMA." Id. at 4. Plaintiff maintains that "[c]learly, the computers of these home office employees were capable of showing all backup inspection reports from all invoices, as that task was later performed, after-the-fact, by Margie Barrett." Id.

Although context is indeed important, the context of the Clayton testimony, coupled with the timeline of Ms. Barrett's analysis, underscores Ms. Barbour's knowledge and complicity in the fraudulent scheme. Ms. Clayton began looking for duplicate PMIs in

invoices rejected by FEMA close to the end of her employment at Alcatec in June 2007. Tr. at 699, 702-03 (Clayton). She therefore alerted Ms. Barbour to the problem with duplicate PMIs between earlier invoices in June 2007. See Tr. at 704 (Clayton). She was told not to worry about looking back at other invoices because the problems FEMA raised would be within one invoice. See id. Ms. Clayton quit, and Ms. Barrett took over her task of scrubbing for duplicate PMIs in rejected invoices in June 2007.

Ms. Barrett similarly was instructed by Ms. Barbour not to perform a month-to-month review of invoices. Tr. at 1308 (Barrett). However, she noticed many duplicate PMIs and performed and completed her own analysis in January or February 2008, Tr. at 1269, 1279 (Barrett), demonstrating that multiple duplicate PMIs were being billed between invoices, see DX 37; see also Tr. at 1271 (Barrett). Ms. Barbour did not instruct Ms. Barrett to perform this analysis, Tr. at 1269, and, when Ms. Barrett relayed the information to Ms. Barbour, she was transferred to a lesser position and removed from the invoicing process, see Tr. at 1283 (Barrett).

The sequence of events is problematic for Ms. Barbour because it shows that, while she was specifically alerted by Ms. Clayton in June 2007 that invoices contained duplicate inspections from month-to-month, Ms. Barbour never performed or instructed her employees to perform an analysis to determine which invoices contained duplications, an analysis that plaintiff points out was possible. See Pl.'s Br. filed July 22, 2011, at 4. Ms. Barrett's research, conducted seven to eight months later, was undertaken on her own initiative. Therefore, Ms. Barbour never instructed the employees who were providing her with backup documentation that was used in resubmitting invoices to perform a month-to-month analysis when she knew from Ms. Clayton that duplicates existed. Ms. Barbour eventually instructed Mr. Oliver to conduct a review of each PMI checklist, but not until Ms. Barrett had left Alcatec in March 2008 and after she had resubmitted invoices to FEMA. See Tr. at 1894-95 (Oliver). However, her specific awareness of duplicates from month-to-month did not stop Ms. Barbour from resubmitting invoices from June to October 2007. See DX 18 at 18.361 – 18.481. 10/

While plaintiff contends that resubmission of invoices previously rejected is somehow different from the initial invoices, it is not. Ms. Barbour was submitting invoices and backup documentation as proof of Alcatec's claim for payment with specific knowledge that

---

10/ Even though Ms. Barbour credited back FEMA in an October invoice, see DX 18 at 18.483 (crediting back thirty-seven CLIN 1001 inspections worth $9,028.00 and 228 CLIN 1002 inspections, worth $55,632.00, both in the January 1-15, 2007 invoice), she already had resubmitted several invoices, disregarding Ms. Clayton and Ms. Barrett's warnings. Plaintiff presented no evidence that Ms. Barbour advised FEMA whether a credit was required for those months.

duplicates existed when the records were reviewed on a month-to-month basis. She did nothing to review this information. Even an argument that plaintiff's private investigator Mr. Breelove performed this analysis fails because none of the employees responsible for giving backup documentation for resubmission of invoices were made aware of the need to review multiple invoices at once. In fact, they were instructed specifically not to review multiple invoices. See Tr. at 704 (Clayton); Tr. at 1307-08 (Barrett). 11/

The court need not list every inconsistent statement that Ms. Barbour made during the course of trial to find that she was not credible. See, e.g., Tr. at 395 (Barbour) (stating that "to the best of [her] knowledge," PMI checklists without supervisor signatures were not billed to FEMA); Tr. at 1901 (Oliver) (stating that Alcatec did not always require supervisor signatures before invoicing FEMA). Compare Tr. at 1019-21 (Oliver) (stating he told Ms. Barbour shortly before FBI raid that FBI had approached him), with Tr. at 248 (Barbour) (testifying that first time she became aware of FBI investigation was when FBI raided Alcatec). The court cannot condone Ms. Barbour's disassociation with fraudulent conduct by merely distancing herself from anyone or any task in the process that might be linked to the root of what she knew was a fraudulent scheme—recording and ultimately invoicing inaccurate PMI checklists. Ms. Barbour was involved in this scheme, and Alcatec is bound by any action she took to conceal, through a chaotic billing system, the actions of Mr. Oliver and other Alcatec employees that perpetrated this fraud.

4. Forfeiture of all claims

The PMI checklists constituted the backup documentation for Alcatec's invoices that were paid by the Government, or the "proof" of a claim against the Government. See 28 U.S.C. § 2514. Therefore, falsified dates on PMI checklists amounted to falsification of the "proof" of a claim through Alcatec's invoicing system. Precedent instructs that "fraud in the 'proof' of a claim, i.e., the falsification of the underlying documents upon which the claim is based, voids each of the claims associated with the contract." Kellogg Brown & Root Servs., Inc. v. United States, No. 09-351C, 2011 WL 2739776, at *11 (Fed. Cl. July 6, 2011) (opinion on motion to dismiss interpreting Little, 152 F. Supp. at 87-88).

_____

11/ Although defendant does not raise issues related to resubmission of invoices, the court undertook an analysis related to resubmission of invoices to examine plaintiff's arguments brought up in its responsive brief filed July 22, 2011, at 3-4. Further, defendant does raise the issue of Ms. Barbour's awareness of duplicate invoicing following her conversation with Ms. Clayton, even if defendant does not argue it within the context of the resubmitted invoices. See Def.'s Br. filed July 7, 2011, at 25 ("Having been advised by Ms. Clayton that there were duplications in the supporting packages for billings prepared for her, Ms. Barbour's contention that she and thus Alcatec submitted billings in good faith is nonsensical.").

Defendant's counterclaim alleges that Alcatec's submitted claim for $3.8 million should be forfeited because the claim for phase-in costs required to perform, among other tasks, inspections on mobile units is a claim directly related to plaintiff's contract with FEMA for those preventative maintenance inspections, a line item under which defendant alleges that plaintiff fraudulently submitted false PMI checklists as the basis for compensation. See Def.'s Br. filed July 7, 2011, at 30-31. CLINs 1001 and 1002 arise under the same contract as plaintiff's phase-in performance, PX 1 at 8, and so substantially relate to plaintiff's performance under CLINs 1001 and 1002, see PX 2 at 1 (describing phase-in tasks as requiring performance of "any and all efforts necessary" to perform the contract), that, because the Government proved fraud under the forfeiture statute, plaintiff must forfeit its claim for phase-in costs associated with the performance of CLINS 1001 and 1002, see Little, 152 F. Supp. at 87-88 ("But where, as in the present case, fraud was committed in regard to the very contract upon which the suit is brought, this court does not have the right to divide the contract and allow recovery on part of it. Since plaintiff's claims are entirely based upon . . . a contract under which he practiced fraud against the Government, all of his claims under the contract will be forfeited pursuant to 28 U.S.C. § 2514.").

## II. Defendant's False Claims Act Claim

### 1. Standards

Defendant further counterclaims that plaintiff violated the FCA, 31 U.S.C. § 3729(a)(1). The FCA recognizes a cause of action when any person "knowingly presents, or causes to be presented . . . a false or fraudulent claim for payment or approval," id., or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," id. § 3729(a)(1)(B). 12/ A person found liable under these

---

12/ The False Claims Act was amended on May 20, 2009, by the Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, § 4(a), 123 Stat. 1617, 1621-22 (to be codified at 31 U.S.C. § 3729). 31 U.S.C. § 3729(a)(1) is now codified at 31 U.S.C. § 3729(a)(1)(A). However, the former § 3729(a)(1) is the relevant provision for the purposes of this case, so the court cites to this provision. See id. § 4(f), 123 Stat. at 1625 (making applicable new provisions to "conduct on or after the date of enactment"). By comparison, the court applies the reformulated 31 U.S.C. § 3729(a)(1)(B) in analyzing defendant's Count II under the FCA. See id. § 4(f), 123 Stat. at 1625 (making applicable new provisions to "conduct on or after the date of enactment" except that "subparagraph (B) of section 3729(a)(1) of title 31, United States Code . . . shall take effect as if enacted on June 7, 2008, and apply to all claims under the False Claims Act that are pending on or after that date" (citation omitted)). Defendant filed its counterclaim alleging a violation of 31 U.S.C. § 3729(a)(1)(B) on June 30, 2010, and as such, newly formulated § 3729(a)(1)(B) is applicable to this case. See Countercls. at 16 n.2.

provisions "is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person." Id. 13/ "Knowingly" applies to a person who has "(1) actual knowledge of the information; (2) [who] acts in deliberate ignorance of the truth or falsity of the information; or (3) [who] acts in reckless disregard of the truth or falsity of the information." Id. § 3729(b). 14/ Critically, "no proof of specific intent to defraud is required" to prove knowledge. Id.

"The government must establish a violation of the False Claims Act by a preponderance of the evidence." Daewoo Eng'g, 557 F.3d at 1340 (citing 31 U.S.C. § 3731(c); Commercial Contractors, 154 F.3d at 1362). To bring an FCA claim, the Government does not have to show that it incurred damages, although a showing of damages as a result of the fraudulent claim is required if the Government seeks to recover damages. See id. at 1341 ("Because the court did not find that the government incurred damages from Daewoo's false claim, the court properly assessed only the statutory penalty."); see also Young-Montenay, 15 F.3d at 1043 (absent proof of harm, Government can recover penalties, but not damages). In Young-Montenay the Federal Circuit set forth the required showing for a damages award:

> In order to recover damages for violation of the False Claims Act, the government must establish that
>
> (1) the contractor presented or caused to be presented to an agent of the United States a claim for payment;
> (2) the claim was false or fraudulent;
> (3) the contractor knew the claim was false or fraudulent; and
> (4) the United States suffered damages as a result of the false or fraudulent claim.

Young-Montenay, 15 F.3d at 1043.

---

13/ Section 5 of the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. 2461 note, authorizes Executive agency adjustments for inflation of civil fines and penalties. The Department of Justice, by regulation, has increased the penalties for FCA violations to a minimum of $5,500.00 and a maximum of $11,000.00. See 28 C.F.R. § 85.3(a)(9).

14/ Similar to § 3729(a)(1), § 3729(b) has been reformulated so that it is codified at § 3729(b)(1), see Pub. L. No. 111-21, § 4(a), 123 Stat. at 1622, but the court applies the former § 3729(b), see id. § 4(f), 123 Stat. at 1625.

The parties agree that, similar to <u>Young-Montenay</u>, plaintiff submitted invoices that were based on inaccurate PMI checklists.  Tr. at 92 ("We agree . . . that the Government is entitled to a setoff in this case for the amount of those inspections that got paid by FEMA that should not have been billed to FEMA."); Tr. at 299 (Barbour) ("We would never knowingly not accurately invoice the Government. . . . It did happen.  I'm sorry about that, and it just slipped through the cracks.").  However, plaintiff challenges defendant's FCA claim on two grounds: (1) that plaintiff did not know at the time that it submitted its invoices that they were fraudulent, and (2) defendant did not prove "the number of specific invoices which contained 'false claims' as proof in support of its claim for penalties under the FCA."  Pl.'s Br. filed July 22, 2011, at 20.  The court will address the latter first.

The Government is required to prove the specific invoices that it alleges were false.  In its analysis under the Forfeiture Statute, the court found that Alcatec management held the specific intent to change or manipulate undated PMI checklists that were billed to the government.  It was not necessary to pinpoint which of the undated PMIs were billed to a specific invoice to render all claims under the contract void.  <u>See Little</u>, 152 F. Supp. at 87-88.  However, "[t]he False Claim Act . . . focuses on the submission of a claim, and does not concern itself with whether or to what extent there exists a menacing underlying scheme."  <u>United States ex rel. Aflatooni v. Kitsap Physicians Serv.</u>, 314 F.3d 995, 1002 (9th Cir. 2002).  Therefore, the Government is required to demonstrate that specific invoices were false and that plaintiff knew of their falsity.

Plaintiff seeks to impose a standard of proof more exacting than demanded by the FCA.  Alcatec challenges that it is "only an *incorrect invoice* which could warrant a penalty against the corporation, not the individual back-up inspection sheets which supported the charges contained in the invoice," Pl.'s Br. filed July 8, 2011, at 13.  However, Navigant submitted proof that individual checklists supplied as backup documentation for specific invoices were false, and it is these checklists that constitute a "false record . . . material to a false or fraudulent claim."  <u>See</u> 31 U.S.C. § 3729(a)(1)(B).  Therefore, defendant's FCA claim is predicated on Navigant's analysis of seven invoices that identify duplicate PMIs listed in the invoices.

Navigant's testimony during trial, coupled with documents admitted as evidence of the Government's summary of Alcatec's submitted invoices, Tr. at 1375 (Reighard), established that plaintiff submitted seven invoices in which it requested compensation for duplicate PMI checklists that constituted false claims.  Mr. Reighard reviewed and verified that Alcatec submitted five invoices that contained duplicate PMI checklists.  <u>See</u> DX 18 at 18.24 (January 9, 2007 payment for November 15-30, 2006 invoice in which FEMA rejected three duplicate checklists); Tr. at 1378-79 (Reighard) (testifying that Navigant determined that six PMIs were performed in less than fourteen days from the previous inspection, three of which were duplicate PMIs); DX 18.53 (January 30, 2007 prepared invoice for December

34

1-31, 2006, and November 1-30, 2006 billing periods in which FEMA rejected fifty-two duplicate checklists); Tr. at 1379-80 (Reighard) (testifying the Navigant found eighty duplicate PMIs in addition to the fifty-two the FEMA discovered and twenty-two PMIs performed in less than fourteen days); DX 18 at 18.146 (January 31, 2007 prepared invoice for January 1-15, 2007 billing period in which FEMA rejected twenty-eight duplicate checklists); Tr. at 1381 (Reighard) (testifying that Navigant discovered an additional twenty-four PMIs performed in violation of the fourteen-day rule, and an additional twenty-nine PMIs that were double-billed); DX 18 at 18.233-34 (March 6, 2007 prepared invoice for February 15-28, 2007, and January 1-31, 2007 billing periods rejecting two PMIs performed after deactivation date); Tr. at 1385 (Reighard) (testifying that Navigant found two PMIs performed in less than fourteen days); DX 18 at 18.360 (May 24, 2007 prepared invoice for April 16-30, 2007, March 1-31, 2007, and February 1-28, 2007 billing periods in which FEMA rejected six PMI duplicate checklists); Tr. at 1393 (Reighard) (testifying that Navigant found thirteen PMI checklists performed less than fourteen days apart); DX 18 at 18.402 (August 31, 2007 prepared invoice paid in full); Tr. at 1394-95 (Reighard) (testifying that Navigant found 169 PMIs that were less than fourteen days apart and thirty duplicate PMI checklists).

Navigant did not review invoice summaries that FEMA rejected in whole, Tr. at 1383-84 (Reighard), but the record supports a finding that these invoices constituted false claims. In an invoice summary dated April 9, 2007, for the March 1-15, 2007 and February 1-28 invoices, COTR Burgett rejected the entire invoice under CLINs 1001 and 1002, amounting to $238,632.00, "due to excessive duplicates of invoice items which calls into question the entire CLINs." DX 18 at 18.282. Again, on April 12, 2007, in relation to what appears to be a resubmission of previous inspections, Mr. Burgett rejected the entire invoice under CLIN 1001, $28,792.00, and CLIN 1002, $132,736.00, stating that "due to recent discovery of double billing a complete audit of these two CLINs for double billing is required." Id. at 18.266. These documents were admitted without objection and evidence a false claim made by Alcatec.

While defendant's Special Plea in Fraud provided clear and convincing evidence that plaintiff intentionally manipulated the dates on PMIs, the lower standards of proof of knowledge under the FCA enable a finding by preponderant evidence that plaintiff "knew" that it submitted duplicate PMI checklists to FEMA for compensation. Ms. Barbour and Mr. Oliver acted, at the least, with "reckless disregard of the truth or falsity" of the PMI checklists. 31 U.S.C. § 3729(b)(1)(A)(iii). Ms. Barbour was responsible for the chaotic billing system detailed above that made it difficult to track an individual mobile unit's history of inspections. See Tr. at 1348-49 (Jones). Ms. Barbour knew that a problem with duplicate PMI checklists existed, but in January 2007, Ms. Jones received December and January spreadsheets from Ms. Barbour that reflected a larger number of PMIs than what the Jones Group had recorded. Tr. at 1341-42 (Jones). Despite her problems with duplicate billing,

35

Ms. Barbour initially refused to provide FEMA with an Excel spreadsheet of her invoice, a measure that eventually greatly aided FEMA in weeding out duplicate PMI checklists that she submitted. See Tr. at 1154-56 (Keeney). She repeatedly and haphazardly faxed invoices and backup documentation to FEMA in the middle of the night without warning. See Tr. at 1157-59 (Keeney). Further, Ms. Barbour and Mr. Oliver failed to take measures that they knew could help ensure compliance. See Tr. at 1901-02 (Oliver) (testifying that Alcatec did not require a supervisor's signature, which could have eliminated some issues in billing); Tr. at 1886 (Oliver) (confirming that Alcatec did not compare checklists against employee time records).

While Ms. Barbour claims to have put "awesome" procedures in place to catch duplicate PMIs, 169 duplicate PMIs in one invoice precludes a finding other than that those procedures were anything but reckless. Therefore, the court finds that (1) Alcatec submitted a series of invoices based on PMIs that it purportedly inspected on certain dates and in compliance with the fourteen-day requirement, (2) that these inspections were not in fact performed on those dates, and (3) that Ms. Barbour and Mr. Oliver acted in reckless disregard for the truth or falsity of these checklists. See Young-Montenay, 15 F.3d at 1043.

The Government seeks an $11,000.00 penalty under 31 U.S.C. § 3729(a)(1) for each of the seven invoices found to violate the FCA. Def.'s Br. filed July 7, 2011, at 35. Given the reckless nature of plaintiff's billing, the court agrees, and awards the Government $77,000.00 in penalties. Defendant also seeks $412,575.12 in investigative costs representing Navigant's expert costs, and $203,008.00 in damages representing the amount of the improper billings. Id. However, Navigant did not tie each of the categories listed in its summary of findings, DX 1 at 1.31, to specific invoices and failed to provide evidence and records as to the total net amount overpaid after FEMA extended credits. In fact, defendant continually changed the amount that it claimed that FEMA overpaid Alcatec. Compare Def.'s Br. filed July 7, 2011, at 35 (claiming $203,008.00 in overpayments to Alcatec), with DX 1 at 1.31 (asserting $203,496.00 in overpayments to Alcatec). While Navigant provided the basis for determining each invoice false, it did not provide a coherent damages analysis. See Tr. at 1513 (Reighard) (requiring redirect examination to correct misstatements made during cross-examination regarding Navigant's ultimate summary of damages recorded in DX 1 at 1.31). The evidence does not give the court confidence in the total amount of overpayments alleged, and, as such, the court declines to award other damages.

Accordingly, pursuant to 31 U.S.C. § 3729(a)(3), the court awards part of defendant's investigative costs for the analysis that Navigant performed in aid of establishing FCA liability and that was used in assessing Alcatec's penalties. Navigant's analysis revealed that Alcatec billed FEMA $143,960.00 in duplicate PMIs and PMIs less than fourteen days apart, DX 1 at 1.31, the two categories that formed the basis of Alcatec's FCA liability. This amount also constitutes over two-thirds of the overall amount of the $203,008.00 that

defendant claims as overpayments.  Therefore, the court awards defendant two-thirds of its claimed investigative costs, or $275,050.00, for its portion of the analysis that aided the presentation of evidence. 15/

## CONCLUSION

The Government proved by clear and convincing evidence plaintiff's fraudulent scheme to manipulate the dates on PMI checklists that ultimately formed the basis of claims against the Government and that called for the forfeiture of plaintiff's claim for phase-in costs.  Acts amounting to recklessness undergird the findings supporting FCA liability and penalties for a failure to adopt reasonable procedures to address a persistent problem of duplicate PMI checklists that plagued administration of this contract.  These results are grounded in the court's impression of the witnesses and evidence presented, but the forfeiture met the high burden of proof required to impose that penalty.  Although plaintiff's counsel admirably advocated for his client's refrain of innocent mistake, in the end, the story that emerged was not one of mistake, but one demonstrating a specific intent to deceive FEMA with regard to the dates on which inspections were performed and a reckless indifference to the hundreds of duplicate inspections that were billed to FEMA.  See Kamen Soap, 124 F. Supp. at 620 ("It is difficult . . . to make up a story that is not apart of . . . one continuous design.").  Accordingly, based on the foregoing, the Clerk of the Court shall enter judgment, as follows:

1.  Against plaintiff on its claim for the unpaid balance of $3.8 million and for defendant on its counterclaim for forfeiture of plaintiff's claim pursuant to 28 U.S.C. § 2514.

2.  For defendant on its counterclaim pursuant to 31 U.S.C. § 3729(a)(1) in the amount of $77,000.00 in penalties and damages in the amount of $275,050.00.

**IT IS SO ORDERED.**

/s/ Christine O.C. Miller
_____
**Christine Odell Cook Miller**
Judge

_____

15/  As a result of the above findings that Navigant could not provide the court an accurate total figure for overpayments, the Government has not proved its entitlement to recover monies erroneously paid, as the court cannot find the amount owed, see Def.'s Br. filed July 7, 2011, at 33, and the court declines to award any additional investigative costs, see id. at 32.